(C.D. 4188)

KURT ORBAN COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided March 22, 1971)

*Samuel Frankel* for the plaintiff.

*L. Patrick Gray, III,* Assistant Attorney General (*Harold L. Grossman,* trial attorney), for the defendant.

Before RAO and NEWMAN, Judges

NEWMAN, Judge: The issue in this case concerns the proper rate of duty on certain galvanized wire imported in January 1962. The merchandise was assessed with duty by the Government at the rate of 0.4¢ per pound under the provision in paragraph 316(a) of the Tariff Act of 1930, as modified, for galvanized round steel wire.

Plaintiff claims that the merchandise is properly dutiable at the rate of ¼¢ per pound under the provision in paragraph 317 of the Tariff Act of 1930, as modified, for galvanized wire, not specially provided for, of the kind commonly used for fencing purposes.

### Statutes Involved

Classified under:

Paragraph 316(a) of the Tariff Act of 1930, as modified by T.D. 54108:

Round iron or steel wire:
Valued not over 6 cents per pound:
Not smaller than 0.095 inch in diameter_____     0.3¢ per lb.

Paragraph 316(a) of said act, as modified by T.D. 52373 and T.D. 52462:

All wire of iron, steel, or other metal (* * *) coated by * * * galvanizing * * * or any other process with zinc, tin, or other metal___     $\frac{1}{10}$¢ per lb. in addition to the rate imposed on the wire of which it is made.

Claimed under:

Paragraph 317 of said act, as modified by T.D. 51802:

All galvanized wire not specially provided for, not larger than twenty one-hundredths and not smaller than eight one-hundredths of one inch in diameter, of the kind commonly used for fencing purposes * * *_____     $\frac{1}{4}$¢ per lb.

### The Record

The record consists of the testimony of three witnesses and sixteen exhibits introduced in evidence by plaintiff, and the testimony of one witness and one exhibit introduced in evidence by defendant.

Plaintiff's first witness, Henri Neuman, testified by deposition taken in France pursuant to a commission issued by the court. Written interrogatories and Neuman's replies thereto were received in evidence as plaintiff's collective exhibit 1. Neuman testified as follows:

He had been associated with the manufacturer of the imported wire, St. Ingbert Works of Hadir, since 1935; had been managing director of that firm since 1957; and was familiar with the wire purchased by plaintiff from Hadir under purchase orders 746–H, 747–H, 750–H, and 751–H (date of shipment stated to be 1963). Hadir had produced the same 6 and 10 gauge wire for approximately ten years without change, and Neuman was familiar with its specifications and methods of production. All 6 and 10 gauge wire was manufactured in the "fencing wire quality, according to American standards".

The 10 gauge wire covered by orders 746–H, and 747–H was galvanized, redrawn or hard wire, and had a tensile strength of 75,000 psi (minimum) to 95,000 psi (maximum). The minimum zinc coating was 0.3 ounce per square foot according to AISI (American Iron and Steel Institute) standards; and the manganese content did not exceed 1%. The 6 gauge wire covered by orders 750–H and 751–H was manufactured to the same specifications as the 10 gauge wire, except that the minimum zinc coating was 0.5 ounce per square foot.

It appeared that the manufacturing sequence was: pickling, drawing, galvanizing, and "redrawing for these diameters is fixed once and for all to obtain the required tensile strength and the zinc coating".

Neuman identified the following exhibits, which were received in evidence as representative samples of the wire:

Collective Exhibit 2: 6 gauge wire in order 750–H
Collective Exhibit 3: 6 gauge wire in order 751–H
Collective Exhibit 4: 10 gauge wire in order 746–H
Collective Exhibit 5: 10 gauge wire in order 747–H

Additionally, there were received in evidence reports of tests covering samples of the subject wire (exhibits 6 and 7). Counsel for the respective parties stipulated that the imported wire is not over 0.20 inch and not under 0.08 inch in diameter, and is galvanized.

Plaintiff's second witness was Andrew B. Ross, district sales manager in Chicago, where he sold, among other items, "wire products, including galvanized wire such as used in the manufacturing of fencing". For some nine years Ross headed the Carbon Steel Wire Department of plaintiff in Jersey City, New Jersey, in which capacity he was in charge of buying the carbon steel wire imported and sold to various customers through sales representatives.

Ross testified that, while visiting "several customers' plants" accompanied by sales representatives, he observed the instant wire utilized in the production of fencing and other items. The witness stated that 85% of his galvanized wire "went into fence production".

In response to questioning by the court concerning the number of plants he had visited, Ross responded: "I couldn't put a number on it"; but he approximated that it was a dozen customers, naming five: Colorguard Corp., Igoe Brothers, Gilbert and Bennett, National Wire, and Wire Sales Co. However, on cross-examination Ross mentioned only Colorguard Corp., where he had seen the merchandise "actually used" for manufacturing chain-link fencing.

Plaintiff's third witness was Joseph M. zVon, general superintendent of Gilbert and Bennett, a manufacturer of wire and various wire products, including fencing. Parenthetically, Gilbert and Bennett was one of the firms mentioned by Ross where he had allegedly

observed the instant wire being manufactured into fencing. However, zVon stated that his firm confined itself to the use of wire with gauges finer than those involved in this case. This inconsistency was never clarified by plaintiff.

zVon testified that he had thirty years of experience in the wire industry; was "generally" familiar with the gauges of galvanized wire manufactured and sold in the United States for fencing purposes; and that he was familiar with the type of wire represented by exhibits 2, 3, 4, and 5 "as it pertains to wire manufacturing". In zVon's opinion, the type of wire represented by the exhibits is "compatible with chain link manufacture". zVon testified that "wire of the same gauges and the same coating and the same tensile strength as these exhibits have been used in other plants * * * for the making of chain link fence".

The witness compared exhibits 2, 3, 4, and 5 with the standards and specifications contained in exhibits 8 through 12. These latter exhibits are:

Exhibit 8: "Commercial Standard CS246–62 (Steel Chain Link Galvanized Fence Fabric)". This exhibit is a "recorded voluntary standard of the trade" published by the U.S. Department of Commerce. Six gauge steel wire having a minimum zinc coating of 1.2 ounces per square foot of actual surface covered meets the standard for chain-link fence fabric.

Exhibit 9: "Standard Specifications for Zinc–Coated (Galvanized) Iron or Steel Farm-Field and Railroad Right-of-Way Wire Fencing". This bears ASTM (American Society for Testing Materials) Designation: A 116–57. These specifications cover three classes of zinc-coated steel wire fencing (galvanized before fabrication), for farm-field fence and railroad right-of-way fence, namely: classes 1, 2, and 3, as designated by the weight of coating in ounces of zinc per square foot of uncoated wire surface.

Table I of this exhibit (minimum weight of coating on zinc-coated wire fencing) shows that 10 gauge steel wire having a minimum zinc coating of 0.30 ounce per square foot of uncoated wire surface is in "Class 1". The imported 10 gauge wire (exhibits 4 and 5) meets this specification.

Exhibit 10: "Tentative Specifications for Zinc-Coated Steel Chain-Link Fabric". These specifications bear ASTM designations A 392–55T and A 392–63T. They cover zinc-coated chain-link fence fabric, galvanized either before or after weaving, having a minimum zinc coating of 1.2 ounces per square foot of uncoated wire surface (Class 1). In Table I (sizes of wire and mesh) 6 gauge wire (size of the *coated* wire) is included.

Exhibit 11: Federal Specification RR–F–221b—Fencing (Barbed Wire, Woven Wire, and Wire Netting).[1] This specification includes 10 gauge steel wire having a minimum zinc coating of 0.30 ounce per square foot of uncoated wire surface. Exhibits 4 and 5 meet this specification.

Exhibit 12: This is a publication of the American Iron and Steel Institute (AISI) captioned "Steel Products Manual – Wire and Rods, Carbon Steel". Table 7–17 (page 45) states:

> *Chain Link Fence Wire* is a low carbon hard drawn wire, uniform in temper and dead cast, of a grade suitable for the production of galvanized chain link fence. It is commonly produced in gages 6, 9, and 11, either bright for fabrication into galvanized-after-weaving fence, or galvanized for fabrication into galvanized-before-weaving fence.

Page 51 of this publication states, *inter alia:* "When specified by type number, the galvanized wire is commonly made to a minimum weight of coating as given under the respective types shown in Table 7–24". The latter table includes 6 gauge wire with "type 1" coating of 0.50 ounce of zinc per square foot of uncoated wire surface, minimum; and also includes 10 gauge wire with a "type 1" coating of 0.30 ounce of zinc per square foot of uncoated wire surface, minimum. Table 7–24 also includes galvanized wire having a "Regular Coating" for which there is "no specified minimum weight of coating".

zVon testified that the 6 gauge wire (exhibits 2 and 3) when fabricated into chain-link fencing and subsequently galvanized would meet the specifications in exhibits 8 and 10 and also would meet the "type 1" coating in Table 7–24 of exhibit 12. Further, he stated that the 10 gauge wire (exhibits 4 and 5) would meet the specifications in exhibits 9 and 11 and would also meet the coating specified in Table 7–24 (exhibit 12) for use as top and bottom wires "and at the same time is the base for the polyvinyl chloride on resin-covered wires".

Additionally, four sales brochures were received in evidence as plaintiff's exhibits 13, 14, 15 and 16 to illustrate that four companies (Colorguard Corp., Allied Fence Co., The Colorado Fuel and Iron Corporation, and Anchor Post Products, Inc.) offer fencing to the trade produced of 6 and 10 gauge galvanized wire.

Defendant's sole witness, John M. Leppert, was employed by United States Steel Corp. as "supervisor, specification metallurgy, wire and wire products", for five years, and had been engaged in wire and wire products metallurgy for thirteen years. Leppert had a total experience

---

[1] This specification was approved by the Commissioner, Federal Supply Service, General Services Administration for the use of all Federal Agencies.

in steel metallurgy over a period of thirty-four years. It appeared, also, that Leppert had two years of graduate study in ferrous metallurgy.

Leppert testified that he knew of no instances were 6 or 10 gauge redrawn wire [2] had been used for fencing purposes, and in his opinion such redrawn wire would not be so used. We quote *in extenso* the reasons for Leppert's opinion (R. 103–4):

> One of the primary reasons for redrawing after galvanizing is to attain close dimensional tolerances, for example, in the size ranges we are discussing here, the standard AISI bright wire tolerance is plus or minus .002″ whereas the recognized AISI tolerance for galvanized wire is minus three-thousandths—.003″. In applications where galvanized wire is required, and dimensional tolerances are critical, the wire must of necessity be drawn after galvanizing to revert back to the bright wire tolerance.

> However, in the case of fence wire, both the 10 gauge which would apply to the woven wire fence, and the 6 gauge which would apply to the chain link fence, the specifications which were previously admitted as evidence permit an extremely liberal tolerance of plus or minus .005″. So, to redraw to attain tolerance, just wouldn't make sense.

> Another reason for redrawing would be to attain a slightly higher tensile strength and for the carbon ranges which we are discussing here now, it would be much more economical, in fact, it would cost really nothing to attain this higher tensile by adding a few points of carbon to the steel, whereas the redrawing is an extra operation which is costly, and it doesn't make sense for it to be done on wire that is going into fencing applications.

With reference to zVon's testimony that Gilbert and Bennett used redrawn wire for fencing, Leppert commented (R. 105):

> * * * There is a point where it is economically advantageous to galvanize and draw after galvanizing in order to get down to the size you want. But *certainly we are talking about considerably under the 10 gauge,[3] which is the smallest size under discussion here today.* [Emphasis added.]

Leppert further testified that ASTM recognizes two grades of 6 gauge chain-link fencing: Class 1 is 1.20 ounces per square foot minimum; class 2 is 2.00 ounces per square foot minimum. He stated that the 6 gauge wire in this case (exhibits 2 and 3), having a zinc coating varying from 0.45 to 0.54 ounce per square foot, would be commercially unacceptable for an order of chain-link fencing "as a finished product"; and that the 1.2 ounces minimum coating weight was applicable to the wire as well as the woven fabric.

---

[2] The wire covered by orders 750–H and 746–H (exhibits 2 and 4) was redrawn, which means that the wire was "drawn through a die, generally one draft after galvanizing" (R.102).

[3] zVon testified that his company used only gauges finer than 6 or 10 gauge.

I.

Preliminarily, we shall discuss defendant's objections concerning plaintiff's collective exhibit 1, the interrogatories propounded to Henri Neuman and the responsive answers. The circumstances were:

On February 24, 1966, plaintiff moved pursuant to rule 21(a) [4] for the issuance of a commission in order to obtain testimony from Neuman, establishing that samples of wire to be offered in evidence by plaintiff were representative of the imported merchandise and covered by the instant protest, and testimony relating to the physical and chemical properties of the imported merchandise. Defendant did not object to plaintiff's motion for a commission. Indeed, on March 11, 1966 defendant submitted a proposed order giving it time within which to file additional cross-interrogatories, if deemed necessary, after receipt of the answers to the direct interrogatories.

On April 4, 1966 the court signed defendant's proposed order. Thereafter on April 8, 1966 plaintiff filed with the court and served on defendant seventeen interrogatories to be propounded to Neuman in Strasbourg, France; defendant filed no objections to any of these interrogatories, and filed no cross-interrogatories.

On May 5, 1966 this court issued a commission to the American Consul or other consular officer of the United States at Strasbourg, France to examine Neuman under oath respecting the interrogatories. The commission and interrogatories were forwarded to the American Consulate in Strasbourg, and on June 17, 1966 Neuman appeared before the American Vice Consul to give his deposition. The substance of his testimony was summarized *supra*.

Interrogatory 5 of the deposition and Neuman's response thereto reads:

> Q. Are you familiar with the 6 and 10 gauge wire purchased from your company by Kurt Orban Co. in their orders 746–H, 747–H, 750–H, and 751–H and shipped by your company through Establissement D'Exportation Et Financiere Pour Trefile Vaduz to Kurt Orban Co. in the year 1963?
> A. I am familiar with the 6 and 10 gauge wire purchased from our company in the orders 746–H, 747–H, 750–H and 751–H, and shipped in 1963 to Kurt Orban Co.

At the trial on January 16, 1969 defendant indicated for the first time—almost three years after service of the interrogatories—that it objected to interrogatory 5 and moved to strike the response thereto. The ground for the Government's objection and motion to strike was

---

[4] Rule 21(a) authorizes the issuance by the court of a commission "to examine witnesses resident in another country * * * whenever it shall appear to the satisfaction of a judge * * * that the testimony of said witnesses is necessary and important * * * and that the attendance of such witnesses cannot reasonably be had".

that both the question and answer were immaterial to the issue before the court, viz.: they concerned merchandise shipped in 1963 whereas the subject merchandise was shipped in 1961. At the trial, we overruled defendant's objection and denied the motion to strike. Defendant also objected to the receipt in evidence of exhibits 2, 3, 4, and 5 "since there is no evidence before the Court that these samples are representative of or are the samples that were exported in 1961 pursuant to Order 746, 750, 751–H and 747–H". We also overruled that objection.

In its brief, defendant has renewed and reiterated the objections made at the trial. We are asked to reconsider the adverse rulings "and to direct that the response to Interrogatory No. 5 be stricken from the record and that Plaintiff's Exhibits 2, 3, 4, and 5 not be received in evidence".

We adhere to our rulings at the trial. There can be little or no merit to defendant's objections in view of the fact that Hadir had produced the same type of wire for approximately ten years with no change in the specifications or manufacturing process.

And in any event, defendant's objection and motion to strike came too late. In a well-reasoned opinion by Maletz, J., in *U.S. Industrial Products Corp.* v. *United States*, 60 Cust. Ct. 618, C.D. 3476, 286 F. Supp. 583 (1968), this court held (at 624–625):

> As to interrogatories for the examination of witnesses, the general requirement (in the absence of a statute or rule to the contrary) is that the objection must be made before trial if the ground of the objection was such as might have been obviated or removed if presented at that time. [Authorities cited]. This requirement is based on the equitable consideration that an objection to a question contained in an interrogatory (or deposition) should be brought to the attention of the party relying on such interrogatory (or deposition) in time to enable him to correct any defect or to substitute additional evidence. [Authorities cited].

> Our rule 21(f) obviously incorporates this requirement * * *. The rule is manifestly designed to provide notice of possible evidentiary shortcomings so that they may be remedied before trial; the filing requirements of the rule would be meaningless otherwise. This is to say that when an interrogatory for the examination of a witness under a commission is filed with the court pursuant to rule 21(f), an objection to the interrogatory must be interposed promptly, if the ground of the objection is such as might be obviated or removed before trial. * * *

Hence, even if the Government's objection to interrogatory 5 were meritorious, the basis for the objection was clearly evident at the time defendant was served with a copy of the interrogatories. In accordance with the principles set forth in *U.S. Industrial Products*, defendant could not withhold its objections to interrogatory 5 until the trial,

when it was too late for plaintiff to remedy the defect. The predicate of defendant's objection, plainly, might have been obviated if it had been presented at the appropriate time.

## II.

We now reach the merits of this controversy.

At the trial, the parties stipulated that the merchandise fell within the particular diameters specified in paragraph 317, as modified, viz., "not larger than twenty one-hundredths and not smaller than eight one-hundredths of one inch in diameter" and that the wire is galvanized. Consequently, the dispute is limited to whether the kind of wire in issue was commonly used for fencing purposes.

Initially, we shall deal with the wire that was redrawn (exhibits 2 and 4). Leppert knew of no cases where 6 or 10 gauge redrawn wire was used for fencing purposes. He explained, in substance, that redrawing was useful either to obtain close tolerance (not required by fencing specifications) or to attain a slightly higher tensile strength (which would be achieved more economically by adding carbon to the steel). He emphasized that redrawing is an extra and costly operation which would not be done on wire "going into fencing applications". It is difficult to believe that 6 and 10 gauge redrawn wire was *commonly* used for fencing purposes, when an expert witness of Leppert's qualification was unaware of such use. In brief, we find no evidence in the record which specifically contradicts or rebuts Leppert's testimony concerning the non-use of 6 and 10 gauge redrawn wire for fencing.

Although plaintiff's witness zVon testified that his company used redrawn wire for fencing purposes, he also stated that his company confined itself to the use of wire finer than 6 or 10 gauge. Thus, Gilbert and Bennett's use of redrawn wire for fencing is consistent with Leppert's testimony that, in the case of finer gauges of wire considerably under 10 gauge), it would be "economically advantageous to galvanize and draw after galvanizing in order to get down to the size that you want".

We conclude, therefore, that the redrawn wire (exhibits 2 and 4) is not "of the kind commonly used for fencing purposes" within the purview of paragraph 317, as modified.

An additional difficulty with plaintiff's case concerns the amount of zinc coating on the 6 gauge wire (exhibits 2 and 3), which varied from 0.45 to 0.54 ounce per square foot of uncoated surface. Although the record establishes to our satisfaction that 6 gauge galvanized wire is commonly used for chain-link fencing, we find that the imported wire would not have been commonly so used unless such wire was to be subsequently galvanized after fabrication or resin coated. Again, we

find it difficult to believe that it was common practice for fencing manufacturers to buy galvanized wire which was required to be regalvanized after fabrication.

Leppert's testimony indicates that the 1.2 ounces per square foot minimum zinc coating specified by the ASTM and the commercial standards was applicable to the wire as well as the fabric. The record shows the following (R.119–120):

> Q. Now, the 1.2 zinc coating which is the minimum zinc coating required by the specifications, does that apply to the finished chain link product or does that apply to the merchandise, the wire used to manufacture the finished product?
>
> A. *I would say it applies to both.* The specification definitely applies to the finished product, but the wire that is used to make the finished product would certainly be expected to have the proper coat, otherwise the finished product won't comply.
>
> Q. Is it required to have that coating weight for the wire being used in the manufacture of the finished product?

\*        \*        \*        \*        \*        \*        \*

THE WITNESS: Yes, unless it is given a subsequent operation or treatment.

BY MR. GROSSMAN:

> Q. By that you mean additional coating, in other words, *galvanizing on top of galvanizing;* is this a standard practice?
>
> A. *I have never heard of it before today.* [Emphasis added.]

On cross-examination, zVon testified that the imported 6 gauge wire could not be used as such to make a galvanized-before-fabric. He stated that the wire must first be formed into a fabric and then regalvanized, or must be used as a base for extruding resin on it. Yet, despite thirty years of experience in the wire industry zVon was not "familiar" with and could not specify a single manufacturer of fencing who regalvanized chain-link fencing fabric made of galvanized wire. Thus, the record contains the following testimony on cross-examination (R. 95–96):

> Q. Did I understand you to say, sir, that you are familiar with certain organizations in your trade that galvanized wire after it had been galvanized?
>
> A. *I didn't say I was familiar.* I said there are many small manufacturing companies who do not have acid facilities and do not have acid disposal facilities who, in many cases, must buy flash galvanized material so as to protect it while in storage, prior to using and hence after fabrication there is no preliminary check over fluxing to put on the required amount.
>
> Q. So that they first galvanize it at that time so that it shall have the adequate zinc coating required by the specifications, ASTM or otherwise?

A. That is right, sir.

Q. Could you tell the court specifically what companies you personally know that indulge in this method of manufacture?

A. We indulge in it as it pertains to our *welded fence, but not as it pertains to our chain link fence.*

JUDGE NEWMAN: Any other companies? Mr. Grossman and the Court would like to know.

THE WITNESS: *Not to my knowledge.* [Emphasis added.]

Furthermore, on cross-examination zVon admitted that he did not know whether Colorguard's resin-coated chain-link fencing was made of 6 or 9 gauge wire.

We find it significant that neither plaintiff's witness zVon nor defendant's witness Leppert, both well-qualified experts, knew of any fencing manufacturers who engaged in the practice of regalvanizing chain-link fencing woven of galvanized wire. Moreover, plaintiff did not produce a single witness from any of its customers who allegedly produced chain-link fencing from the imported wire!

Although Ross testified that Colorguard resin coated the imported wire to make fencing, the record does not establish that the wire was commonly used for fencing of that type.

Finally, we have noted that the American Iron and Steel Institute publication referred to *supra* at page 45, indicates that chain-link fence wire is "either *bright* for fabrication into galvanized-after-weaving fence, or *galvanized* for fabrication into galvanized-before-weaving fence".[5] There is nothing in the AISI publication (or other standards admitted in evidence) which suggests that galvanized wire having the zinc coating of exhibits 2 and 3 would be commonly used in galvanized-after-weaving fencing. On the contrary it is pointed out that the wire commonly used for galvanized-after-weaving fence is *"bright".*

For the foregoing reasons, the protest is overruled as to exhibits 2, 3 and 4.

We now turn to exhibit 5: the 10 gauge wire covered by order 747–H. According to exhibit 7, that merchandise had a zinc coating of 0.394 ounce per square foot of uncoated wire surface. This is adequate to meet the "Class 1" ASTM specification A 116–57 (exhibit 9) for farm-field and railroad right-of-way fencing. Exhibit 5 also meets the minimum zinc-coating requirement for 10 gauge fencing wire in Federal Specification RR–F–221b (exhibit 11). Moreover, Leppert testified that United States Steel Corp. manufactures 10 gauge wire for farm and field fence use.

Under all the facts and circumstances, we find that exhibit 5 constitutes galvanized wire of the kind commonly used for fencing purposes within the purview of paragraph 317, as modified.

---

[5] Emphasis added.

In accordance with the conclusions reached herein, plaintiff's protest is sustained as to the 10 gauge wire covered by order 747–H and represented by exhibit 5. As to the balance of the merchandise covered by orders 750–H, 751–H, and 746–H, and represented by exhibits 2, 3, and 4, the protest is overruled. Judgment will be entered accordingly.